Luciano Bonanni and MRI ENTERPRISES, INC., Individually and as a member of MRI ENTERPRISES, LLC and MRI ENTERPRISES, LLC, Plaintiffs,

against
Horizons Investors, Corp., BENITO FERNANDEZ a/k/a B.R. FERNANDEZ, ADEX MANAGEMENT CORP., SOLOMON KALISH, ALLAN HAUSKNECHT, M.D., and COMPREHENSIVE IMAGING OF NEW YORK, PLLC, Defendants.


17029-05

LAURENCE SHIFF PC
Attorney for Plaintiffs
747 Third Avenue, 23rd Floor
New York, New York 10017
JASPAN SCHLESINGER LLP
Attorneys for Defendants Horizons Investors Corp., Benito Fernandez, Allan Hausknecht, M.D., and Comprehensive Imaging of New York, PLLC
300 Garden City Plaza
Garden City, New York 11530
THE LAW FIRM OF ADAM KALISH P.C.
Attorney for Defendant Solomon Kalish & Adex Management Corp.
9306 Flatlands Avenue
Brooklyn, New York 11236


Elizabeth H. Emerson, J.



[*2]DECISION AFTER TRIAL
FACTS
The plaintiff Luciano Bonanni ("Bonanni") is an executive vice president of Fonar Corporation ("Fonar"), a Long Island manufacturer of magnetic resonance imaging ("MRI") equipment, and the sole owner of the plaintiff MRI Enterprises, Inc. ("MRI Inc."). In 1995, Bonanni and MRI Inc. provided a Fonar .3 Tesla mobile MRI scanner to the defendant Dr. Allan Hausknecht ("Dr. Hausknecht"), a neurologist with an office in Islip Terrace, New York. Dr. Hausknecht employed the defendant Solomon Kalish ("Kalish") to manage his practice. Kalish knew the defendant Benito Fernandez ("Fernandez"), a businessman with contacts at the New York City Health and Hospitals Corporation ("HHC"). Fernandez believed that HHC was looking for an inexpensive way to put MRI scanners in its hospitals. Kalish and Fernandez talked about forming an MRI company to service HHC hospitals, but they were not familiar with MRI equipment. Kalish was aware of Bonanni's familiarity with MRI scanners and his affiliation with Fonar. 
In 2000, Fonar had just obtained FDA approval for its newly developed .6 Tesla stand-up (or upright) MRI scanner and was looking for a way to break into the hospital market. At about the same time, Kalish introduced Bonanni to Fernandez. In February 2001, Bonanni, Fernandez, and Kalish met with Jose Sanchez, the executive director of two HHC hospitals, Metropolitan and Lincoln, to pitch a proposal to lease a Fonar .6 Tesla stand-up MRI scanner to Lincoln Hospital. The parties agree that Sanchez liked the proposal. However, because Sanchez had an urgent need for MRI scanners at Metropolitan Hospital as well as Lincoln Hospital, the proposal was changed to accommodate the immediate radiological needs of both hospitals. The proposal was changed to install the older Fonar .3 Tesla scanners in the parking lots at the two hospitals and to replace them at a later date with higher grade equipment, which would be permanently installed inside the hospitals. The proposal, as amended, was approved by HHC.
On July 19, 2001, Bonanni, Fernandez, Kalish, and Dr. Hausknecht (the "Principals") formed the plaintiff MRI Enterprises, LLC ("MRI LLC"), inter alia, "to own and operate an MRI scanning facility or facilities." An operating agreement was prepared by Fonar's lawyers (the "Operating Agreement"). It provided for profits and losses to be allocated in accordance with the members' ownership interests. The members were the defendant Horizons Investors Corp. ("Horizons"), which was wholly owned by Fernandez; the plaintiff MRI Inc., which was wholly owned by Bonanni; the defendant Adex Management Corp. ("Adex"), which was wholly owned by Kalish; and Dr. Hausknecht. Horizons had the largest ownership interest in MRI LLC, 40%. The remaining 60% was owned by MRI Inc. (20%), Adex (20%), and Dr. Hausknecht (20%). Although the Operating Agreement was silent on the type of equipment (Fonar or some other brand) that MRI LLC would acquire for its facilities, the record reflects that it was understood that Fonar would provide the equipment given Bonanni's expertise and affiliation with Fonar and HHC's approval of the installation of Fonar equipment at both hospitals. 
To contract with HHC and to comply with the New York Education Law, MRI LLC needed a physician or a professional medical corporation to deliver the medical services. Accordingly, the defendant Comprehensive Imaging of New York, PLLC ("CINY"), was formed to provide the MRI services to the patients at Lincoln and Metropolitan Hospitals and to employ the radiologists who read the MRI scans. CINY was owned by Dr. Hausknecht.[FN1]
On October 1, 2001, MRI LLC and CINY executed a management services organization agreement (the "MSO"). It provided for MRI LLC to furnish CINY with office space; with telephone, secretarial, clerical, and reception services; with supplies and equipment; with billing, collection, and other financial management services; among other things. MRI LLC retained a billing company to bill insurance companies for CINY's services. The payments were deposited into a CINY bank account from which CINY paid the radiologists employed by it, Dr. Hausknecht, and MRI LLC. The fee for MRI LLC's services was initially set at $2,000 a month. It increased to $67,744 a month after February 28, 2002, and to $250,000 a month in July of 2007.[FN2]

On November 1, 2001, MRI LLC entered into licensing agreements with HHC for the right to occupy space in the parking lots at Lincoln and Metropolitan Hospitals for a term of five years. In addition, MRI LLC and HHC executed service agreements giving MRI LLC the right to provide MRI services to patients at both hospitals. In January 2002, Bonanni arranged for MRI LLC to become a Fonar sales representative. The following month, MRI LLC purchased two reconditioned Fonar .3 Tesla scanners for which it received a commission in the amount of approximately $36,000. The commission was applied to the members' capital accounts in proportion to their ownership interests in MRI LLC. The machines were installed in the hospitals' parking lots, and the scanning of patients began in March 2002 at Lincoln Hospital and in April 2002 at Metropolitan Hospital. After about a year, the business began to earn a profit. Beginning in February 2003, profits were distributed to the members of MRI LLC in direct proportion to their ownership interests therein. Compensation was limited to the distribution of profits, and no one was paid a salary for any work that he did for the business. Bonanni, who considered himself to be the "face" of MRI LLC because he managed all aspects of the day-to-day operation of the business, received no additional compensation for his services. 
Almost from the very beginning, Dr. Harold Tanenbaum, the chief of radiology at Lincoln Hospital,[FN3]
had concerns about the images produced by the Fonar .3 Tesla scanner installed there. [*3]Dr. Tanenbuam testified that the images were inadequate for diagnosis of the types of conditions for which they were needed at the hospital. He testified that the problems with the Fonar .3 Tesla scanner were "extensive" and "obvious to anyone that was a physician." He testified that none of the 12 to 14 radiologists employed by Lincoln Hospital wanted to read the scans, that the reports based on them were imprecise, and that he did not want to put his name on the reports. He also testified that, since Metropolitan Hospital saw many of the same types of patients as Lincoln Hospital, it would have had similar problems. Dr. Hausknecht testified that the images produced by the Fonar .3 Tesla scanners were often blurred and could not be used for diagnosis. He also testified that Metropolitan Hospital experienced many of the same problems as Lincoln Hospital.
In view of the problems with the Fonar .3 Tesla scanners, Bonanni, Fernandez, Kalish, and Dr. Hausknecht began to discuss their replacement. Bonanni favored replacing them with Fonar .6 Tesla uprights. The hospitals wanted 1.5 Tesla industry-standard scanners, which Fonar did not make. Fonar's competitors Siemens and General Electric both made 1.5 Tesla scanners. The parties eventually agreed to install a Siemens 1.5 Tesla scanner at Lincoln Hospital. On December 22, 2003, MRI LLC and Siemens entered into a 60-month lease with an option to purchase such a unit.[FN4]
Although Bonanni agreed to install the Siemens unit at Lincoln Hospital, he still hoped to install a Fonar .6 Tesla upright at Metropolitan Hospital.
On January 21, 2004, the parties executed an amended operating agreement for MRI LLC (the "Amended Operating Agreement"). Section 3.9 provided for the withdrawal of members after two years from the date of execution of the Amended Operating Agreement upon not less than 180 days' written notice. Section 6.7 gave the remaining members the right to purchase a withdrawing member's share, and the procedure for effectuating such a purchase was found in sections 6.8 through 6.12. Schedule B of the Amended Operating Agreement set the price of a withdrawing member's share at 50% of $450,00 (the previously agreed upon value of the business as of December 31, 2003) multiplied by the withdrawing member's ownership interest in MRI LLC. Section 7.1 of the Amended Operating Agreement provided for the sale, transfer, or assignment of a member's interest in MRI LLC to a third party with the prior approval of the members having two-thirds voting interests.[FN5]
 Section 7.4 gave MRI LLC and the remaining members a right of first refusal and set forth the procedure for effectuating that right.
In 2004, Fernandez and Bonanni disagreed on two important issues related to the management of MRI LLC: replacement of the Fonar .3 Tesla scanner at Metropolitan Hospital and renewal of the Fonar sales-representative agreement. Bonanni favored replacing the Fonar .3 [*4]Tesla scanner at Metropolitan Hospital with a Fonar .6 Tesla upright. He attempted to persuade the hospital's physicians and administrators to consider the Fonar .6 Tesla upright by giving tours of Fonar's facility in Melville, New York. He also proposed placing two MRI scanners at Metropolitan Hospital: a Fonar .6 Tesla upright and a 1.5 Tesla unit made by one of Fonar's competitors. The two-machine proposal would have been expensive to implement, and Fernandez was not in favor of it. Fernandez was also not in favor of keeping MRI LLC as the Fonar sales- representative. Fernandez wanted to have himself or one of his wholly owned companies named as the representative. Thus, any commissions from Fonar would be paid to Fernandez and not to MRI LLC. Bonanni wanted MRI LLC to remain as the Fonar sales representative so that any commissions would be shared by the members of MRI LLC in proportion to their ownership interests therein. 
The conflict between Bonanni and Fernandez came to a head at a meeting of the members of MRI LLC on April 26, 2005. While the parties dispute exactly what happened at that meeting, one thing is clear: Fernandez would not agree to the installation of Fonar equipment at Metropolitan Hospital, which caused Bonanni to reconsider his continued membership in MRI LLC through his wholly owned company, MRI, Inc. 
In early May 2005, Bonanni checked MRI LLC's bank account and noticed that Horizons, Adex, and Dr. Hausknecht had been paid their monthly distributions of profits, but that MRI Inc. had not been paid. He then wrote a check to MRI Inc. for the same distribution as Adex and Dr. Hausknect, the other 20% members. On May 12, 2005, he sent a letter as the president of MRI Inc. to Adex, Horizons, Dr. Hausknecht, and MRI LLC. The text of the letter is, in pertinent part, as follows: 
"I cannot describe how sick I felt on Monday May 9 when I discovered that a distribution was made without including MRI Enterprises, Inc. This is a breach of our Agreement.
* * *
"I am extremely disappointed in the fact that what started out as a business formed exclusively to ultimately purchase and install Fonar Upright MRI's at both Lincoln and Metropolitan Hospital has now been changed by Horizons' 40% minority vote to the exclusion of Fonar altogether. A decision of this magnitude requires a supermajority vote. This represents another breach of our Agreement. What bothers me even more is the basis on which that decision was made which I will not get to at this time.
"I have stated on numerous occasions to the members, MRI Enterprises, Inc.'s inability to continue as a member, without Fonar's presence at either Lincoln or Metropolitan Hospital. [*5]Therefore, I must proceed with MRI Enterprises, Inc.'s sale, since the decision has now been made to purchase another high-field magnet for Metropolitan and to exclude Fonar from consideration even though there is adequate space to install both.
* * *
"MRI Enterprises remains a 20% member of the LLC and is entitled to its distribution of $3,000. Therefore, I have withdrawn a check for $3,000 payable to MRI Enterprises, Inc. from the LLC's account on May 10. Furthermore, you now leave me with no choice but to insist on the following before I resume any activity related to MRI Enterprises, LLC:
"1.match an offer to purchase MRI Enterprise, Inc.'s 20% share of MRI Enterprises, LLC's interest. If MRI Enterprises, LLC rejects the offer, MRI Enterprises, Inc., is permitted to proceed with the transaction and transfer its interest;
"2.agree on a valuation of MRI Enterprises, LLC's business as of the transfer date and distribute to MRI Enterprises, Inc. its share of 20%. I have calculated that distributions may total $1,000,000 this calendar year. Therefore, MRI Enterprises is entitled to receive approximately $50,000 (for the period from Jan 1 to April 30) in addition to the $15,000 already distributed this year;
* * *
"If we cannot agree in principal to these terms, I can no longer in good conscience continue to cooperate with you. Therefore, a dissolution may be the only remaining option."
Bonanni, as the president of MRI Inc., sent a second letter to Adex, Horizons, and Dr. Hausknecht before receiving a response to his May 12, 2005, letter. Bonanni's second letter is dated May 23, 2005. The subject line is: "Re: Option Notice-Bonafide Offer to Purchase MRI Enterprises, Inc's 20% Interest." The text of the letter is as follows: 
"I have received bonafide offers to purchase MRI Enterprises, Inc.'s 20% interest in MRI Enterprises, LLC. The offers are from Dr. Stephen Hershowitz and Dr. Robert Diamond.[FN6]

"The combined offers total $250,000. Each offer is for a 10% share (50% of MRI Enterprises, Inc.'s 20% share). The purchase price is $125,000 payable in five (5) equal annual installments of $25,000, commencing one (1) year from date of transfer. The combined annual payments total $50,000. Dr.'s Hershowitz and Diamond are ready, willing and able to proceed immediately.
"I believe MRI Enterprises, Inc.'s interest is worth significantly more, however, I am willing to accept the offer immediately. As you have a right of first refusal to purchase MRI Enterprises, Inc.'s interest, please advise me as to whether or not you wish to exercise this right."
Adex, Horizons, Dr. Hausknecht, and MRI LLC responded to Bonanni's May 12, 2005, letter with a letter dated June 1, 2005. The text of that letter is as follows:
"We are in receipt of your letter dated May 12, 2005.
"In response to your statements in the letter, we will respond in the order they appear.
"1.Distributions are no longer being made. The majority stockholders have decided to pay specific members for services being rendered upon the LLC specific request.
"2.We disagree that MRI Enterprises, LLC was formed exclusively to purchase Fonar products. This issue shows the breach of your fiduciary duties to MRI Enterprises, LLC and its members. It is obvious to us that your interests are in Fonar to the detriment of our LLC, as shown by your actions and the unfair agreements between Fonar and our LLC.
"3.You are directed not to represent nor act in any capacity or take any action on behalf of MRI Enterprises, LLC.
"4.You are further directed to return any and all paperwork, materials and property of MRI Enterprises, LLC to Sol Kalish as soon as possible.
"5.At the last Board meeting on April 26, 2005, attended by all members, you announced your decision to resign, as a result of our determination not to purchase a Fonar unit.
"6.Your action of withdrawing money from the company's checking account without authority is hereby noted and condemned. You are instructed to return said money.
"7.As to your other issues, be advised that we will adhere to the agreement dated January 21, 2004. Please abide by its instructions in submitting your resignation and sale of your 20% interest.
"Action by written consent of MRI Enterprises, LLC. The following members, that comprise the super majority of 80% have agreed to the above instructions and responses to your letter of May 12, 2005 and have signed their names below to so indicate."
The letter was signed by Kalish on behalf of Adex and MRI LLC, by Fernandez on behalf of Horizons, and by Dr. Hausknecht.
Adex, Horizons, and Dr. Hausknecht responded to Bonanni's May 23, 2005, letter with a letter dated June 3, 2005. The text of that letter is as follows:
"We are in receipt of your letter dated May 23, 2005.
"We again reiterate that we will adhere to the agreement dated January 21, 2004. Please abide by its instructions in submitting your resignation and sale of your 20% interest.
"Be further advised that your option-notice does not apply to the process of sale of your 20% interest. Schedule B is the applicable clause, along with clauses 6.7, 6.8, 6.9, 6.10, 6.11 and 6.12.
"Action by written consent of MRI Enterprises, LLC. The following members, that comprise the super majority of 80% have agreed to the above response to your letter of May 23, 2005 and have signed their names below to so indicate."
The letter was signed by Kalish on behalf of Adex, by Fernandez on behalf of Horizons, and by Dr. Hausknecht.
Bonanni, as the president of MRI Inc., responded to the letters dated June 1 and June 3, 2005, with a letter dated June 13, 2005, to Kalish on behalf of Adex, to Fernandez on behalf of Horizons, and to Dr. Hausknecht. The text of that letter is, in pertinent part, as follows:
"At the outset, let it be perfectly clear that neither I nor MRI [*6]Enterprises, Inc. have resigned, wish to resign or have any intention of resigning from MRI Enterprises, LLC. To the contrary, I believe that MRI Enterprises, LLC has a bright and very profitable future and I have every intention of continuing to participate in the management of same, as I have done from its inception.
"That being said, you indicated recently that you wish me and MRI Enterprises, Inc. to leave the company and, in furtherance of same, you made an offer to buy me out. Despite the fact that I am under no obligation to leave or sell my interest, I am willing to entertain a good faith offer to purchase my interest in the company based on the true value of my ownership. Your offer of $45,000, however, is laughable since, as you know, it is a mere fraction of what the real value of my interest is worth. * * *
"I recently delivered to you two independent offers that I received to purchase my interest in the company....[T]he amount of [the] offers must be construed as the fair market value of my ownership interest, which is $250,000. Ironically, even under the formula you wish to use in Schedule B, my value would be worth close to this amount making your $45,000 unrealistic even under your own assumptions. The sale of my interest based upon these bona fide offers would not only give you the unfettered control over the company, which you so desire, it would provide me with the fair market value of my interest which I am entitled to receive. In other words, it is a win-win situation for all of us.
* * *
"Your reference to Schedule B and certain sections of the Operating Agreement is misguided because I am not withdrawing from the Company and do not wish to leave. Rather, it is you who are attempting to "squeeze me out" of the company in bad faith. Moreover, I have repeatedly requested that the members establish the current value of the company which, they are supposed to do annually, but each time I make such request, Mr. Fernandez, who has orchestrated the current efforts to force me out of the company, has specifically refused to do so.
* * *
"Please note that your actions, designed to force me out of MRI Enterprises, LLC are threatening the continued viability of the business. They constitute action which, by the terms of the Operating Agreement, could result in dissolution of the business. Thus, in order to prevent the irreparable harm that could result from your actions, demand is hereby made that you immediately: reinstate me to the corporate bank account, include me in all management decisions and actions, pay to me my proportionate share of all payments and/or distributions made to any other members, cease making unilateral payments to yourselves which do not include me, reinstate payment of the company's distributions and, cease making any remarks to any third party which could cause injury to me or my reputation in the industry."
Kalish responded to Bonnani's June 13, 2005, letter by a letter dated June 29, 2005, on MRI LLC's letterhead. The text of the letter is, in pertinent part, as follows:
"We are in receipt of your letter dated June 13, 2005.
"We have no interest in making you resign. The three of us, myself, Ben and Allan, heard you resign at our last meeting of April 26, 2005 and assumed you meant what you said.
"As to the issue of selling your stock, our agreement is quite specific as to how stock can be sold. However, to accommodate you, we have no objection to your selling your 20% to Drs. Hershowitz and Diamond, as per your letter of May 23, 2005. Please proceed as instructed by our agreement dated January 21, 2004.
"The rest of your threatening and insulting letter does not deserve to be addressed. However, we again remind you that you have no duties with and are not authorized to act on behalf of MRI Enterprises, LLC. You have also been directed to return all company papers and products to me as previously requested.
"You are a 20% equity holder of this company and if it produces a profit and the company decides to make a distribution, you will receive your 20% share."
The only signature on the letter is Kalish's, which was made with a signature stamp. Fernandez and Dr. Hausknecht did not sign the letter. They testified, however, that they approved the sale of Bonnani's 20% interest in MRI LLC to Drs. Hershowitz and Diamond. The record reflects [*7]that the sale was not completed.
After June 2005, Fernandez took over the management of the business and exercised complete control over both MRI LLC and CINY, running both companies as a single entity. The record reflects that he often failed to observe corporate formalities and often blurred the lines between MRI LLC and CINY, using their funds interchangeably. Acting on behalf of Horizons, Fernandez provided the business with office space, maintained the books and records, dealt with hospital administrators, and made all of the important financial and management decisions. Kalish, acting on behalf of Adex, took over Bonanni's responsibilities running the business day-to-day. Dr. Hausknecht continued to oversee the medical services provided to the hospitals. Kalish and Hausknecht allowed Fernandez to take control of the business because Kalish was financially dependent on it and Hausknecht was a busy doctor with no time to run it. On September 28, 2005, they formalized their new arrangement in a resolution dated as of July 1, 2005, which vested the management of MRI LLC in Horizons and Adex and designated Fernandez as the Chief Executive Officer and Kalish as the Chief Operating Officer. Bonanni was, thus, relieved of all responsibilities on behalf of MRI Inc., although he continued to serve as a resource to Kalish behind the scenes.
Kalish testified that, after July 2005, Fernandez decided to stop distributing profits to the members of MRI LLC and to pay them fees for services rendered to the business instead. Bonanni, who had been relieved of all of his responsibilities and was barred from acting on behalf of the business, had no opportunity to provide any services. He, therefore, was not eligible to receive any compensation. The record reflects that the decision to pay for services rendered instead of distributing profits was designed to exclude Bonanni and MRI Inc. from receiving any compensation. The payments for services rendered were, in fact, disguised distributions of MRI LLC's profits. 
Kalish also testified that Fernandez decided to split MRI Inc.'s 20% ownership interest in MRI LLC among the other members thereof. Thus, Horizons' ownership interest was raised to 50% and Adex's and Dr. Hausknecht's to 25% each. The record reflects that, after Bonanni's ouster, distributions of profits to the other members of MRI LLC were made on a 50-25-25 basis. The record also reflects that the distributions were made from accounts maintained by both MRI LLC and CINY. Between May 2005 and October 1, 2013, approximately $2 million in profits were paid to Horizons and Fernandez, Adex and Kalish, and Dr. Hausknecht. Another $1.5 million in profits were paid to Warminster Investors Corp. ("Warminster"), which was wholly owned by Fernadez.[FN7]

In 2010, HHC required that Lincoln Hospital's MRI service contract be executed by a [*8]physician-owned professional corporation and not MRI LLC. On November 1, 2010, HHC and CINY entered into an MRI services agreement for Lincoln Hospital. Dr. Hausknecht hired Fernandez to administer the contract and to run the business day-to-day. Since MRI LLC was not a party to the new agreement, it sold the Siemens 1.5 Tesla scanner at Lincoln Hospital to CINY for $108,000. In March 2011, Kalish was arrested and indicted in connection with an unrelated corruption scandal. Upon learning of Kalish's indictment, Metropolitan Hospital terminated its contract with MRI LLC. After the contract with Metropolitan Hospital was terminated, MRI LLC was no longer a going concern. In 2012, the defendants transferred all of MRI LLC's assets and employees to CINY. The consideration for the transfer was the partial satisfaction of purported loans made by CINY to MRI LLC. However, the record reflects that, when the transfer was made, CINY owed substantially more money to MRI LLC than MRI LLC owed to CINY. At the time of trial, CINY, Fernandez, and Dr. Hausknecht continued to operate the MRI scanning facility at Lincoln Hospital. PROCEDURAL HISTORY
Bonanni, MRI, Inc., and MRI LLC commenced this action in July 2005 against Horizons, Fernandez, Adex, Kalish, Dr. Hausknecht, and CINY.[FN8]
The plaintiffs allege, inter alia, that the defendants engaged in oppressive conduct toward Bonanni and MRI Inc. in an attempt to squeeze them out of their minority interest in MRI LLC and to force them to resign. The complaint, as amended, contains 11 causes of action. Two have been withdrawn, and one was dismissed by an order of this court dated February 9, 2007. The remaining causes of action are for an accounting; for injunctive relief; to recover damages for breach of fiduciary duty, unjust enrichment, breach of contract, and conversion; and to recover damages for looting, waste, and misappropriation of MRI LLC's assets and corporate opportunities. Horizons, Adex, and Dr. Hausknecht counterclaim against MRI Inc. for breach of contract, breach of the duty of good faith and loyalty, and breach of fiduciary duty. 
The case did not proceed to trial until 2013 for a variety of reasons including, inter alia, a protracted period of time for the completion of discovery, a large number of pre-trial motions, and the plaintiffs' representation by seven different attorneys. The trial commenced on October 21, 2013, without a jury. Due to the complexity of the matter, conflicts in the court's trial calendar, and difficulties in scheduling witnesses, the trial continued for approximately 30 days over the course of the next 14 months. All of the Principals testified, as did Dr. Tannenbaum and the plaintiffs' forensic accountant, among others. More than 200 exhibits were admitted into evidence. The trial ended on December 15, 2014. Post-trial briefs were submitted in 2015. The last brief was received by the court on October 21, 2015. 
LIABILITY
The central issue in this case is whether MRI Inc., which was wholly owned by Bonanni, effectively withdrew from membership in MRI LLC. The court finds that the plaintiff has established by a preponderance of the credible evidence that MRI Inc. did not withdraw from MRI LLC.
Section 3.9 of the Amended Operating Agreement provides that a member may withdraw after two years from the date of execution thereof upon not less than 180 days prior written notice to MRI LLC and its remaining members. The Amended Operating Agreement was executed on January 21, 2004. Therefore, no member could withdraw before January 21, 2006. The defendants contend that Bonanni orally withdrew on behalf of MRI Inc. on April 26, 2005, and that he memorialized the withdrawal in his letter dated May 12, 2005. Those dates are less than two years from the date of execution of the Amended Operating Agreement. Thus, no withdrawal was permitted at that time. Even if the defendants waived the two-year requirement, any withdrawal had to be in writing. Bonanni's May 12, 2005, letter and subsequent correspondence do not indicate that MRI Inc. was withdrawing from MRI LLC. Rather, they indicate that Bonanni wanted MRI Inc. to continue to be a member of MRI LLC until he could sell its 20% interest to the defendants or a third-party for what he considered a fair price.
The defendants rely on the following statement by Bonanni in the May 12, 2005, letter in support of their contention that MRI Inc. withdrew from the LLC: 
"I have stated on numerous occasions to the members, MRI Enterprises, Inc.'s inability to continue as a member, without Fonar's presence at either Lincoln or Metropolitan Hospital."
The defendants ignore that, in the same letter, Bonanni also stated, "MRI Enterprises remains a 20% member of the LLC and is entitled to its distribution of $3,000." They also ignore that, in the same letter, Bonanni asks them to "match an offer to purchase MRI Enterprise, Inc.'s 20% share of MRI Enterprises, LLC's interest."
In his next letter dated May 23, 2005, Bonanni gave the defendants notice, pursuant to section 7.4 of the Amended Operating Agreement, that he had received bona fide offers to purchase MRI Inc.'s 20% interest in MRI LLC from Drs. Hershowitz and Diamond. 
In his subsequent letter dated June 13, 2005, Bonanni reiterated that MRI Inc. continued to be a member of the LLC:
"At the outset, let it be perfectly clear that neither I nor MRI Enterprises, Inc. have resigned, wish to resign or have any intention of resigning from MRI Enterprises, LLC. "
[*9]and
"Your reference to Schedule B and certain sections of the Operating Agreement is misguided because I am not withdrawing from the Company and do not wish to leave." 
Moreover, he again stated that he wanted to sell MRI Inc.'s interest in MRI LLC and urged the defendants to match the $250,000 offer by Drs. Hershowitz and Diamond.
The letters dated June 1 and June 3, 2005, from Fernandez, Kalish, and Dr. Hausknecht indicate that they did not consider Bonanni's letter dated May 12, 2005, to be an effective withdrawal and that they required any withdrawal to comply strictly with the terms of the Amended Operating Agreement. After stating that they would adhere to the Amended Operating Agreement dated January 21, 2004, Fernandez, Kalish, and Dr. Hausknecht directed Bonanni to "abide by its instructions in submitting your resignation and sale of your 20% interest." In the June 3, 2005, letter, they even referred Bonnani to schedule B and the specific sections of article 6 of the Amended Operating Agreement governing withdrawal and the purchase of a withdrawing member's interest in MRI LLC. Moreover, Kalish's letter to Bonanni dated June 29, 2005, acknowledged, "You are a 20% equity holder of this company and if it produces a profit and the company decides to make a distribution, you will receive your 20% share."
Bonanni testified that, because of his position as an executive vice president of Fonar, he could not be affiliated with a company that did not use Fonar products. He, therefore, could not be the "face" of MRI LLC and could not manage the business day-to-day if he had to promote non-Fonar products. He testified that he did not intend for MRI Inc. to withdraw as a member of MRI LLC, he just no longer wanted to be MRI LLC's manager.[FN9]
Section 3.7 (c) of the Amended Operating Agreement permits a manager to resign as a manager, but to remain as a member of MRI LLC. It provides, in pertinent part, "The removal or resignation of a manager who is a member, does not affect in any way such manager's rights, duties, privileges and obligations as a member nor does it constitute a withdrawal as a member." The court finds that, while Bonanni may have resigned as a manager, he did not withdraw on behalf of MRI Inc. as alleged by the defendants and that MRI Inc. continued to be a member of MRI LLC. 
As previously noted, Bonanni wanted to sell MRI Inc's 20% interest in MRI LLC to Drs. Hershowitz and Diamond for $250,000; and, on May 23, 2005, he sent the defendants an option-notice in accordance with section 7.4 (a) of the Amended Operating Agreement. The defendants [*10]did not match the offer. Instead, they offered to buy MRI Inc.'s interest for $45,000, which they contend was the maximum price to which MRI Inc. was entitled under schedule B of the Amended Operating Agreement. The court finds that the defendants' reliance on schedule B is misplaced. Schedule B sets the redemption price of a member's interest in the case of the death or withdrawal of a member. It is not applicable to the sale of a member's interest to third parties. The sale of a member's interest is governed by article 7 of the Amended Operating Agreement. Article 7 gave the other members the right to purchase all or part of MRI Inc.'s interest "upon the price and terms of payment designated in the Option Notice and written offer." Thus, the defendants could have purchased MRI Inc.'s 20% interest in MRI LLC for $250,000, and Bonanni was not required to accept their $45,000 offer. In the absence of a sale of MRI Inc.'s interest to the defendants or to Drs. Hershowitz and Diamond, MRI Inc. continued to be a member of MRI LLC.
Rather than compensate Bonanni for MRI Inc.'s ownership interest in MRI LLC, the defendants used Bonanni's purported withdrawal as a pretext to freeze MRI Inc. out. Profits, which had been the sole source of compensation for the members of MRI LLC, were no longer distributed, and compensation was based solely on services rendered. Bonanni's responsibilities for the day-to-day operation of the business were taken away and given to Kalish. Even though Bonanni no longer wanted to be the "face" of MRI LLC or its manager, he could have been given other responsibilities, but he was barred from taking any action or acting in any capacity on behalf of MRI LLC. He, therefore, was unable to perform any services for which MRI Inc. would be compensated. In addition, MRI Inc.'s 20% ownership interest was divided among the other members of MRI LLC, with Horizons/Fernandez receiving 10% and Adex/Kalish and Dr. Hausknecht receiving 5% each. The payments to them for the services they rendered to MRI LLC after Bonnani's ouster were, in fact, distributions of MRI LLC's profits and were made in direct proportion to their new ownership interests in MRI LLC (50-25-25). Neither Bonanni nor MRI Inc. have received any compensation from MRI LLC since Bonanni withdrew $3,000 from MRI LLC's checking account on May 10, 2005. 
In view of the foregoing, the court finds that Horizons, Adex, and Dr. Hausknecht breached the Amended Operating Agreement which, like the original Operating Agreement, provided for profits and losses to be allocated to the members of MRI LLC in accordance with their ownership interests therein. The court also finds that Horizons, Adex, and Dr. Hausknect converted to themselves MRI Inc.'s 20% ownership interest in MRI LLC and, in doing so, breached their fiduciary duties to MRI Inc. Contrary to the defendants' contentions, the business judgment rule does not apply. The business judgment rule only applies in the absence of fraud, bad faith, self-dealing, misconduct, or breach of fiduciary duty (see, Jones v Surrey Cooperative Apartments, Inc., 263 AD2d 33, 36). Accordingly, the court finds in favor of MRI Inc. on the second, fourth, and fifth causes of action for breach of fiduciary duty, breach of contract, and conversion, respectively.
Fernandez and Kalish were not members of MRI LLC individually, but through their wholly owned corporations. Horizons and Warminster acted as conduits for payments from [*11]CINY and MRI LLC to Fernandez, and Adex acted as a conduit for payments from CINY and MRI LLC to Kalish. Fernandez and Kalish were the beneficiaries of those payments. Thus, Fernandez and Kalsih were unjustly enriched by the exclusion of MRI Inc. from its share of MRI LLC's profits. Accordingly, the court finds in favor of MRI Inc. on the third cause of action for unjust enrichment.
DAMAGES
The record reflects that, between May 2005 and October 1, 2013, MRI LLC and CINY paid Fernandez, Horizons, Kalish, Adex, and Dr. Hausknecht a total of $1,964,488, including salary payments to Kalish and Fernandez in the amounts of $573,850 and $102,491, respectively.[FN10]
Deducting Kalish's and Fernandez's salaries from the total amount paid leaves $1,288,147, which the court finds were distributions of MRI LLC's profits. 20% of $1,288,147 equals $257,629. The record also reflects that, during the same period of time, MRI LLC and CINY paid Fernandez through Warminster another $1,552,287 in profits. 20% of $1,552,287 equals $310,457. Thus, Horizons, Fernandez, Adex, Kalish, and Dr. Hausknecht owe MRI Inc. $568,086 ($257,629 plus $310,457) for the period from May 2005 through October 1, 2013. Horizons and Fernandez are liable for 50% of that amount or $284,043. Adex and Kalish are liable for 25% or $142,021.50 and Dr. Hausknecht for the remaining 25% or $142,021.50. When, as here, damages were incurred at various times, interest may be computed on all of the damages from a single reasonable intermediate date specified by the court (CPLR 5001[b]). Accordingly, the court finds that interest shall be computed on the aforementioned amounts from August 1, 2009. 
COUNTERCLAIMS & DEFENSES
The defendants contend that, under the doctrine of res judicata, the plaintiffs are barred from recovering the payments that were made to Warminster. The record reflects that, in 2012, MRI Inc. commenced a derivative action on behalf of MRI LLC in the Supreme Court, Kings County, against CINY and Warminster, inter alia, to recover $933,649 that CINY had paid to Warminster. Pursuant to a so-ordered stipulation dated November 30, 2012, MRI Inc.'s claim against Warminster was withdrawn with prejudice. The defendants contend that, since the withdrawal was with prejudice, res judicata precludes the plaintiffs from recovering the payments to Warminster in this action.
Res judicata, or claim preclusion, is invoked when a party, or those in privity with that party, seek to relitigate a disposition on the merits of claims or causes of action arising out of the same transaction or series of transactions that were raised, or could have been raised, in a prior litigation (Eagle Surgical Supply, Inc. v AIG Indemnity Ins. Co., 40 Misc 3d 139(A) at *1) [*12][and cases cited therein]). Once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if they are based upon different theories or seek a different remedy (O'Brien v City of Syracuse, 54 NY2d 353, 357). A stipulation of discontinuance which specifies that it is "with prejudice" raises a presumption that the stipulation is to be given res judicata effect in future litigation on the same cause of action (North Shore-Long Is. Jewish Health System, Inc., v Aetna US Healthcare, Inc., 27 AD3d 439). However, the language "with prejudice" is narrowly interpreted when the interests of justice or the particular equities involved warrant such an approach (Van Hof v Town of Warwick, 249 AD2d 382; Dolitsky's Dry Cleaners v Y L Jericho Dry Cleaners, 203 AD2d 322, 323). To apply the doctrine of res judicata, there has to be an identity of parties and a final adjudication on the merits (see, Benjamin v New York City Dept. of Health, 17 Misc 3d 1122 [A] at *4, affd 57 AD3d 403, citing Siegel, NY Practice § 444, at 751 [4th ed). The record reflects that MRI Inc. discontinued the Kings County action against Warminster even before an answer had been filed. Thus, there was no disposition on the merits. Moreover, it does not appear that MRI Inc. was given any consideration in exchange for giving up its claims against Warminster (see, Benjamin v New York City Dept. of Health, supra at *6). Accordingly, the court finds that the so-ordered stipulation dated November 30, 2012, in the Kings County action should not be given res-judicata effect. 
The defendants contend that the plaintiffs' claims are barred by the doctrine of unclean hands because Bonanni and MRI Inc. breached their fiduciary duties to MRI LLC and its members. The defendants also contend that Horizons, Adex, and Dr. Hausknecht are entitled to judgment in their favor on their counterclaims sounding in breach of fiduciary duty.
The court finds that the defendants have failed to establish by a preponderance of the credible evidence that Bonanni and MRI Inc. breached their fiduciary duties to MRI LLC and its members. Bonanni's affiliation with Fonar and Fonar's desire to enter the hospital market were well-known to the defendants and served as the basis for the formation of MRI LLC. It was Bonanni's expertise and affiliation with Fonar that allowed MRI LLC to install MRI scanners at Lincoln and Metropolitan Hospitals and to begin earning a profit quickly. The defendants contend that Bonanni and MRI Inc. delayed replacement of the Fonar .3 Tesla scanners in order to further their own interests. The record reflects, however, that Bonanni agreed to replace the Fonar scanner at Lincoln Hospital with a Siemens scanner. Moreover, while he may have advocated for the continued use of Fonar equipment at Metropolitan Hospital, the court finds that his advocacy did not rise to the level of a conflict of interest or breach of fiduciary duty. The defendants' contention that Bonanni caused MRI LLC to lose $10,000 a month at each hospital is supported only by Fernandez's conclusory testimony. The defendants failed to proffer any expert testimony or documentary evidence in support thereof. Accordingly, the court finds that the defendants' claims of breach of fiduciary duty and unclean hands are unsupported by the evidence. 
In view of the foregoing, the second and third counterclaims for breach of the duty of good faith and loyalty and breach of fiduciary duty are dismissed. The first counterclaim for [*13]breach of contract is deemed abandoned since the defendants have not proffered any arguments in support thereof.
DERIVATIVE CLAIMS
The seventh and ninth causes of action are derivative in nature. They seek to recover for the defendants' alleged looting, waste, and misappropriation of MRI LLC's assets and corporate opportunities.
The plaintiffs have failed to establish the value of any of the assets that were transferred from MRI LLC to CINY other than the Seimens 1.5 Tesla scanner. The plaintiffs have established by a preponderance of the evidence that the defendants engaged in self-dealing when they sold the Siemens scanner to CINY for only $108,000. The plaintiffs' appraiser gave the Siemens scanner a fair-market value of $523,303. The defendants proffered no expert testimony in opposition thereto, relying instead on the trade-in value that Siemens gave the scanner. The trade-in value, however, did not take into account some the scanner's coils, which were expensive, and that the scanner was being sold in place, which significantly added to its value. The difference between the fair-market value and the trade-in value of the Siemen's scanner is $415,303. A shareholder of a corporation, even of a closely held corporation, may not recover in his or her individual capacity for wrongs committed against the corporation (Sakow v Waldman, 124 AD3d 860, 862). Any recovery obtained pursuant to a derivative cause of action asserted by a shareholder is obtained for the benefit of the injured corporation (Id.) or, in this case, the LLC. Accordingly, the court finds that MRI LLC is entitled to recover from the defendants $415,303 with interest from January 23, 2012, the date of the sale of the Siemens scanner to CINY.
The record reflects that Jaspan Schlesenger, LLP ("Jaspan Schlesenger"), represented MRI LLC in connection with several matters for which MRI LLC had no obligation to pay its fees.[FN11]
The legal fees in those matters amounted to $251,206. The record also reflects that MRI LLC paid Jaspan Schlesenger $76,305 in connection with this matter.[FN12]
Limited Liability Company Law § 420 allows an LLC to advance and pay its members' legal expenses when there has been no judgment or final adjudication that the individual defendants acted in bad faith, were dishonest, or personally gained financial profits to which they were not entitled (Van Der Lande v Stout, 13 AD3d 261, 261-262). There is now a final adjudication by the court that Horizons, Fernandez, Adex, Kalish, and Dr. Hausknecht received financial profits to which they were not entitled. Thus, MRI LLC is entitled to recover the $76,305 paid to Jaspan Schlesenger in connection with this matter, as well as the $251,206 paid to Jaspan Schlesenger in connection with those matters for which MRI LLC had no obligation to pay its fees. The fees were paid at various times between 2005 and 2013. When, as here, damages were incurred at various times, [*14]interest may be computed on all of the damages from a single reasonable intermediate date specified by the court (CPLR 5001[b]). Accordingly, the court finds that interest shall be computed on the total amount of $327,511 from August 1, 2009. 
ACCOUNTING
The court finds that, as a member of MRI LLC, MRI Inc. is entitled to an accounting of any and all payments from MRI LLC to Horizons, Warminster, and Fernandez; Adex and Kalish; and Dr. Hausknecht after October 1, 2013, the last day for which information was available at trial. The court also finds that MRI Inc. is entitled to an accounting of any and all payments from CINY, MRI LLC's alter ego and successor-in-interest, to Horizons, Warminster, and Fernandez; Adex and Kalish; and Dr. Hausknecht for the same period of time. Accordingly, the court finds in favor of MRI Inc. on the first cause of action for an accounting. 
INJUNCTIVE RELIEF
The plaintiffs seek an injunction permanently enjoining the defendants from paying any additional legal fees to Jaspan Schlesenger and directing the defendants to return the legal fees previously paid on their behalf.[FN13]
To be entitled to a permanent injunction, the plaintiffs are required to establish irreparable harm and the absence of an adequate legal remedy (McDermott v City of Albany, 309 AD2d 1004, 1005). The plaintiffs have failed to establish either. The plaintiffs have been awarded money damages for the previously paid legal fees, and money damages are an adequate remedy for any improper payment of legal fees to Jaspan Schlessinger in the future. Accordingly, the tenth cause of action for a permanent injunction is dismissed. 
CONCLUSION
The court finds in favor of MRI Inc. on the second, third, fourth, and fifth causes of action for breach of fiduciary duty, unjust enrichment, breach of contract, and conversion, respectively, and awards MRI Inc. the following damages on those causes of action: (1) $284,043 against Horizons and Fernandez with interest from August 1, 2009, (2) $142,021.50 against Adex and Kalish with interest from August 1, 2009, and (3) $142,021.50 against Dr. Hausknecht with interest from August 1, 2009. 
The court finds in favor of MRI LLC on the derivative causes of action (seven and nine), and awards MRI LLC the following damages on those causes of action: (1) $415,303 against all defendants with interest from January 23, 2012, and (2) $327,511 against all defendants with interest from August 1, 2009. 
The court finds in favor of MRI Inc. on the first cause of action for an accounting and directs the defendants, within 90 days after service upon them of a copy of the final judgment in this action with notice of entry, to provide MRI Inc. with an accounting of any and all payments from MRI LLC and CINY to Horizons, Warminster, and Fernandez; Adex and Kalish; and Dr. Hausknecht after October 1, 2013. 
Bonnani is not entitled to any relief because he is not a member of MRI LLC. Moreover, the court declines to award punitive damages.
The tenth cause of action for a permanent injunction and the counterclaims are dismissed. 
Finally, in reaching its determination, the court has considered the testimonial and documentary evidence admitted at trial and the post-trial briefs. Any subsequently prepared materials that were not admitted into evidence at trial were not considered. 
DATED: March 9, 2016
_____________________________
J.S.C.



Footnotes

Footnote 1:Initially, Dr. Hausknecht owned 99% and another physician owned 1%. After 2007, CINY waswholly owned by Dr. Hausknecht. 

Footnote 2:The record reflects that CINY paid $2,000 to MRI LLC for the first five months. Thereafter, with few exceptions, its payments to MRI LLC fell short. In January 2004, CINY owed MRI LLC $1,111,799, for which it executed a grid promissory note in favor of MRI LLC. By October 2010, the principal balance due on the grid note had increased to $2.4 million.

Footnote 3:Dr. Tanenbaum testified that he also had staff privileges at Metropolitan Hospital.

Footnote 4:The record reflects that three months earlier, in September 2003, Fernandez signed a consulting agreement with Seimens, which entitled him to be paid a commission for new orders of Seimens equipment. Fernandez testified that the commission he earned in connection with the lease of the Seimens unit to MRI LLC was not paid and that he had to commence a lawsuit against Siemens.

Footnote 5:The members' voting interests were equal to their ownership interests.

Footnote 6:Drs. Hershowitz and Diamond were radiologists who worked at Fonar and read MRI scans for MRI LLC and CINY.

Footnote 7:In 2007, Warminster took over for Horizons and began providing the office space, bookkeeping, accounting, and other services that Horizons had been providing to MRI LLC and CINY until then.
Footnote 8:The court notes that the complaint asserts derivative claims on behalf of MRI LLC for looting, waste, and misappropriation of its assets and corporate opportunities without naming MRI LLC as a nominal defendant, as required.

Footnote 9:Section 3.7 (b) of the Amended Operating Agreement provides that managers shall be elected by a vote or written consent of at least two-thirds of the voting interests of all members entitled to vote. While it does not appear that Bonanni was elected as MRI LLC's manager by a formal vote or written consent, the record reflects that he was MRI LLC's de facto manager and that Fernandez, Kalish, and Dr. Hausknecht allowed him to act as a manager without objection.

Footnote 10:The court finds that, contrary to the plaintiffs' contentions, the salary payments to Kalish were not excessive. 

Footnote 11:CINY was a defendant in at least one of those matters.

Footnote 12:CINY paid another $262,500 to Jaspan Schlessinger in connection with this matter.

Footnote 13:The plaintiffs seek the return of legal fees paid to Jaspan Schlessinger by both MRI LLC and CINY. That relief is derivative in nature. Since the plaintiffs are not members of CINY, they have no standing to seek such relief on behalf of CINY.